## FREEMAN PETERSON v. DAIRY DISTRIBUTORS, INC., AND OTHERS.

129 N. W. (2d) 908.

July 24, 1964—Nos. 39,270, 39,279.

*McLeod & Gilmore,* for relators employer and Iowa Mutual.
*Tyrrell, Jardine, Logan & O'Brien* and *Raymond W. Fitch,* for relator Empire.
*John R. Parker,* for respondent employee.

FRANK T. GALLAGHER, C.

Certiorari to review a decision of the Industrial Commission.

Freeman Peterson, herein called employee, filed a petition with the commission for compensation and benefits for injuries allegedly arising out of and during the course of his employment as a driver for Dairy Distributors, Inc., referred to as employer. The claimed injuries occurred on June 8, 1959, when the employer was insured against compensation liability by the Iowa Mutual Insurance Company, designated as Iowa Mutual, and on January 22, 1962, when the employer's compensation insurer was Empire Fire and Marine Insurance Company, referred to as Empire.

In their answer, the employer and Iowa Mutual claimed that the initial injury of June 8, 1959, was aggravated by the injury sustained by the employee on January 22, 1962. The employer and Empire interposed a joint answer acknowledging that coverage was afforded by Empire effective January 1, 1961, but alleging that the condition of which the employee complains arose out of his accident of June 8, 1959, and was neither aggravated nor caused by anything which occurred since January 1, 1961.

The evidence submitted to the referee consisted of the testimony of the employee and Dr. Robert M. Barnett, a Minneapolis orthopedist, who treated him for the original injury and for the injury of January 22, 1962.

The referee found that on June 8, 1959, the employee sustained an injury to his right leg arising out of and in the course of his employment which resulted in a temporary total disability of 6 and 2/5 weeks, and that Iowa Mutual, then the compensation carrier for the employer, had paid compensation for that period and medical and hospital expenses.

The referee also found that on January 22, 1962, the employee "suffered a personal injury (aggravation of pre-existing right knee condition) arising out of and in the course of his employment"; that as a result of that injury he suffered temporary total disability for a total period of 14 weeks and a 10-percent permanent partial disability of the right leg; and that he had necessarily incurred specified medical and hospital expenses. The referee placed the full burden of compensation liability resultant from the 1962 injury upon the employer and Empire.

The employer and Empire appealed from the decision of the referee to the Industrial Commission, which held by a unanimous decision that the disability suffered following the injury of January 22, 1962, was attributable to both accidents in that the later accident aggravated the preexisting condition of the right knee caused by the 1959 injury.

In a memorandum accompanying the decision of the Industrial Commission, Commissioner James Pomush stated:

"Evidence indicates that the employee injured his knee on June 8,

1959 as well as on January 22, 1962. In describing his difficulties after June 8, 1959 and before January 22, 1962, the employee described clicking, swelling and locking of the knee. He had been advised by Dr. Barnett to have an operation prior to this time. Although after January 22, 1962, his condition became worse, he still had the same symptoms following June 8, 1959. In part of the record, Dr. Barnett states his opinion to be that both the injuries of June 8, 1959 and January 22, 1962, caused the condition for which surgery was required. In another part of the record, the doctor testified that the muscle injury was related to the incident of June 8, 1959, and the knee injury to the incident of January 22, 1962. However, in another part of his testimony, he stated that the symptoms that the employee had following June 8, 1959, were those of a torn cartilage.

"Giving due credence to the employee's testimony and to the variance of the testimony of Dr. Barnett, we conclude that both of the injuries caused the needed surgery and resultant temporary total disability and permanent partial disability.

"We, therefore, are holding both insurers individually and jointly liable, and assessing their liability between each other on the basis of 50%."

The employer and Iowa Mutual applied for certiorari and now contend that the evidence establishes conclusively that the original injury of June 8, 1959, was not a cause of any of the disability resulting from the injury of January 22, 1962. Empire also applied for certiorari, contending that the employee's disability was not related to the incident of January 22, 1962, and that the evidence had established that the 1959 injury had caused aggravation of a knee condition antedating that injury.

The question before us is whether the decision of the Industrial Commission determining that both injuries combined to produce the disability is sustained by the evidence.

The employee testified that he had a wholesale milk route on June 8, 1959, the date of his first accident. He stated that the only trouble that he had with his right knee prior to that date was that a few times

"the thing was clicking" and that the knee cap would feel as if it were a little out of joint.

He said that on June 8, 1959, he jumped out of the cab of his truck and twisted his right knee; that thereafter he noticed a swelling in the right leg; that he was hospitalized and treated by Dr. Bloedel; and that Dr. Barnett was called in for consultation. Treatment was traction and rest. He was off work 6 and 2/5 weeks and then returned to the same kind of work, delivering milk to stores, restaurants, rest homes, hospitals, and commercial enterprises. Some of the duties of his occupation included placing cases of milk weighing 60 to 70 pounds on dollies and rolling them into the customers' premises.

The employee said that after he returned to work he had some difficulty periodically with his right knee in kneeling and that it would click and lock, but that he was able to walk and load or unload the milk without any difficulty. He did not receive treatment on account of the knee from the time of his return to work until the event which occurred on January 22, 1962. About 6 a. m. that day, while lifting a 5-gallon can of milk out of his truck, the employee slipped on the ice, twisted his back, and "went down on both of my knees." Once again the initial care was given by Dr. Bloedel who again referred him to Dr. Barnett. On April 13, 1962, Dr. Barnett performed surgery on the knee and continued to care for the employee until July 19 of that year, when he was able to return to work.

Upon cross-examination, the employee gave a more detailed description of the difficulty that he had experienced with his knee during the interval from June 8, 1959, to January 22, 1962. He said that he had "some clicking" more or less all of the time as he walked and some pain "more or less everyday" which lasted from 5 minutes to an hour. He also stated that his knee "locked" several times during that period. The witness went on to say that he worked in January 1962 but took the next month "off on my own." He said that he had a 2-week vacation coming at that time and that he took an additional 2 weeks in February during which time he said his knee was sore. When he returned to work he said his condition was improved but flared up again when he was working. He claimed that the condition

of his right knee which he first experienced in June 1959 never completely disappeared.

The question raised by the employer and Iowa Mutual on appeal is whether the employee's 1959 injury was causally related to the disability and hospital and medical expense incurred as a result of the surgery in 1962. They contend that the commission erred, as a matter of law, in determining that the 1959 injury played a part in the disability sustained and the surgery performed in 1962.

In that connection, Dr. Barnett testified that when he first examined the employee on June 12, 1959, he had considerable swelling in his right leg from the knee to the ankle, tenderness along the medial side of the calf muscles from the knee to the ankle, and some discoloration of hemorrhage in the lower half of the leg near the ankle. He said there was also evidence of a cartilage tear in his right knee although the knee was not swollen and its motion was good. The doctor said that he expressed an opinion at that time that the employee's problem was probably a rupture of the plantaris muscle in the right leg, which accounted for the swelling, and that he had a cartilage tear inside his knee which was probably of long standing prior to the June 8 injury. The basis upon which he made his diagnosis of a cartilage tear was that the employee had given him a history "of multiple episodes of catching and giving away in his knee." The witness said that the treatment he prescribed for the employee at that time—hot packs, bandages, and elevation—was not directed at the knee but at the "muscle rupture or supposed muscle rupture" in the calf of the leg and that the patient "made a good recovery from that injury."

Dr. Barnett did not see the employee between June 15, 1959, and March 8, 1962. He told Dr. Barnett that during that period his knee had behaved fairly well, but that he had had "catching and giving away" intermittently. According to the doctor, the employee then informed him that in the early part of January 1962 he was working and slipped on some ice and twisted his knee rather severely. This produced pain on the medial side of the knee accompanied by swelling that had subsided, but he continued to have clicking and catching in his knee and he also complained at that time of some aching pain in

his back when he was doing heavy work. This was relieved by rest.

The doctor said that on examination on that date the finding of a cartilage click was about the same as was demonstrated in 1959, but in addition, on the March 8, 1962, visit there was atrophy or shrinking of the thigh muscles on the right leg. The joint line in the knee was tender on the medial side. He examined some X rays of the knee which had been taken by Dr. Bloedel on January 24, 1962, and felt that they showed that the knee was "essentially normal." He diagnosed employee's difficulty as a "[t]ear of the medial cartilage in the right knee."

On April 13, 1962, surgery was performed to remove the medial cartilage and the doctor found that "there was a rather sizeable tear in the posterior part of this cartilage."

The employee was discharged from the hospital on April 17, 1962. The knee gradually improved after the surgery. By July 10 the employee had good thigh muscle and knee motion, with some pain when kneeling or squatting, and was then about to return to work. His last office visit with the doctor was September 13, 1962, which was "more in connection with his back problem than the knee."

Dr. Barnett was asked to relate the surgery he had performed to the incidents of June 8, 1959, and January 22, 1962. He replied: "* * * I am quite sure that this man had a torn cartilage as of the 12th of June, 1959, and by the history he gave me at that time I am led to believe that the cartilage was probably torn before the accident of June the 8th, '59. I think it's entirely possible that the tear could have been extended or made more severe by the January, '62, injury."

He was asked which one or whether both of the incidents made the surgery necessary and said:

"I think I'd have to say both for this reason: That in '59 I would have been willing on the findings that I had at that time to operate on his knee, but we didn't, because Mr. Peterson did not want it done at that time and then he has changed his mind in '62 following this other injury and then requested surgery, so I think we'd have to consider both injuries into this. As I said before, I think the cartilage

had been torn all along. Just a matter of his telling what he wanted to do about it.

"Q. Yes, can you tell us how you feel about permanent disability that you have rated the 10 per cent disability, what is your opinion as regard to that, to the two incidents as we have described them here?

"A. Difficult to separate the two. I think his permanent disability would have been the same had we operated in '59 after the first injury."

Upon cross-examination, Dr. Barnett was asked if he thought the employee injured the medial cartilage in his right knee in the 1959 accident. He replied that he didn't really know as there was no swelling in the knee and no signs of severe injury to the cartilage when he examined the employee 3 days after that accident. He then thought that the tear in the cartilage had existed prior to June 8, 1959, so he could not state with certainty that the accident caused any change in it.

When he saw the employee again in 1962, the only significant change the doctor found with respect to the cartilage was the atrophy of the thigh muscle, a condition which normally takes place over a period of time when a cartilage injury is present. He said that he did not measure the employee's thighs in 1959 so he could not say for certain that atrophy was not present then. The witness said in summary that, to the best of his judgment, it would be fair to say that what the employee had was a torn medial cartilage which existed sometime prior to June 8, 1959, and continued to exist thereafter, gradually getting worse, and that it was possibly aggravated in January 1962. He said that he could not say for certain that the tear was extended or made worse by the injury of January 22, 1962, although he thought that "very likely it did, but I couldn't say as to probability."

When the referee questioned the doctor as to whether there was any probable aggravation of the employee's right knee because of the injury of June 8, 1959, the doctor said that in his opinion that injury "really affected" the employee's knee. He then referred to his notes taken after his first visit, which read: "I believe this man has a medial cartilage tear of long standing. He now has signs of symptoms of rupture of the plantaris muscle as the cause of his current problem."

The doctor said that this was still his opinion. He was then asked by the referee for his opinion as to whether or not the episode of January 22, 1962, aggravated the preexisting torn cartilage and said, "I think it did."

The employee was recalled for redirect examination again in the light of Dr. Barnett's testimony and testified as to his knee condition prior to the 1959 accident. He said that the "clicking" never disabled him; that he had never seen a doctor in regard to it; that he had taken no home treatments for it and had never had any swelling in it. When asked about "locking" the witness said that "it would be difficult when I was on my knees to get up, it would not lock it would click." The referee asked him if before June 8, 1959, the knee would lock so that he would have to manipulate it with his hands to get it away from the locked position. The employee replied: "I could have had it. A couple of occasions [I] could have had them." He said that when he twisted his knee June 8, 1959, he felt pain mostly in his knee and in the calf of his leg.

Dr. Barnett was recalled after hearing the additional testimony of the employee. He was asked for his opinion as to what happened to the employee's knee on June 8, 1959, and stated:

"I can't change my testimony. I still believe that his injury was to the plantaris muscle in the right leg, and as far as my records show or as far as I can recall, I don't think there is any injury to the medial cartilage which I could detect at that time, recent injury I meant to say."

When asked whether there is any way to tell the extent of a tear of the cartilage without surgery, the witness replied that no one can be certain how much of the tear existed.

It is apparent here that the dispute involving the employee's claim is primarily a dispute between Iowa Mutual and Empire. From a review of the testimony, however, it is evident that the problem before us exists because of the vagueness of Dr. Barnett's testimony with respect to the effect of the 1959 injury.

The employee concludes in his brief that the evidence supports a finding that the 1959 and 1962 accidents combined to bring him to

a point where he felt that surgery was necessary. It is, therefore, his position that the decision of the Industrial Commission should be affirmed.

In summary, Empire contends that the record as a whole discloses that the torn cartilage—the reason for surgery—existed before either injury in this case, and that the symptoms of the torn cartilage increased after the 1959 injury. It also contends that Dr. Barnett's opinion that the cartilage tear was probably extended as a result of the January 1962 incident is not founded on medical findings or physical symptoms, but rather on the conjecture of what he thinks the employee thought, and that this conjecture is incorrect according to the employee. It submits that the order of the Industrial Commission allowing benefits against Empire should be reversed or, in the alternative, be affirmed in all things.

Iowa Mutual claims that Dr. Barnett's testimony clearly stated that the 1959 injury was to the plantaris muscle in the right leg and that the torn medial cartilage in the right knee had been present for some time prior to that date. It, therefore, contends that neither the doctor's testimony nor that of the employee supports a finding that the cartilage condition was in any way affected by the injury and that the decision of the commission should be reversed in so far as the award against Iowa Mutual is concerned.

The decision of the Industrial Commission will not be disturbed unless it is manifestly contrary to the evidence or unless consideration of the evidence and inferences permissible therefrom would clearly require reasonable minds to adopt a contrary conclusion. Luna v. Armour & Co. 259 Minn. 48, 105 N. W. (2d) 689; McGuire v. Viking Tool & Die Co. 258 Minn. 336, 104 N. W. (2d) 519.

Although the record in this case is not entirely satisfactory, particularly with respect to the apparent variance in the medical testimony, there does appear to be sufficient evidence to support the finding of the Industrial Commission which divides the responsibility between the two carriers. For that reason, it is our opinion that the decision should be affirmed.

Affirmed.